# EXHIBIT B

# Mitchell H. Hugonnet, Ph.D.

*Clinical & Forensic Psychology*
Palisades Partners
5840 MacArthur Boulevard, N.W.
Washington, DC 20016
(202) 246-4846 (mobile)
(202) 537-5840 (office)
1-866-362-4846
*Toll Free Facsimile and Phone*
Email: mitchell.hugonnet@gmail.com
Licensed in DC, MD, VA

July 15, 2009

Jon W. Norris, Esq.
503 D Street, NW
Suite 250
Washington, DC 20001
(202) 371-0300
jonnorrislaw@gmail.com

      Re:    United States v. John Boughton
              United States District Court for the District of Columbia
              Docket Number: 1:09cr084-01

<u>Privileged & Confidential</u>

Dear Mr. Norris:

      Pursuant to your request I have prepared this psychological assessment of your client Dr. John Boughton for consideration by United States District Judge Emmet G. Sullivan at sentencing on July 29, 2009. I understand that Dr. Boughton is before the Court after pleading guilty on April 17, 2009 to one count of Possessing Material Constituting or Containing Child Pornography in violation of 18 USC 2252A(a)(5)(B) and 2256(8).

      As you already know, I have practiced forensic psychology for over 20 years: 14 years directing a forensic pre-trial unit in the John Howard Pavilion of St. Elizabeth's Hospital and six years at the Child Guidance Clinic of the Superior Court of the District of Columbia where I am currently the Director of Internship Training. At the Court I conduct and train doctoral students in forensic psychological evaluation. Over the course of my career I have conducted court ordered and privately retained forensic evaluations of adults and juveniles in the following areas: sex offender risk for recidivism, violence risk assessments, insanity, diminished capacity, competency to stand trial, parental fitness, fitness for duty (see below), juvenile transfer to adult court, neuropsychological, psychological and psycho-educational assessments. In my private practice I have qualified as an expert witness in forensic psychology in U.S. District Courts in Maryland and Washington, DC, state and county courts in Maryland, Virginia and Washington,

1

DC. I was a consulting psychologist to Police and Fire Clinic Associates for nearly eight years (2001-2008); in that capacity I conducted over 200 psychological evaluations to determine fitness for duty or retirement disability for the DC Metropolitan Police Department, DC Fire Department, U.S. Park Police and the U.S. Secret Service. I am certified (CSTP) to conduct sex offender risk assessments in the Commonwealth of Virginia and I direct the juvenile sex offender program (JIBM) for the Child Guidance Clinic of the Superior Court of the District of Columbia. For this report I employed the following procedures:

- Interviews and psychological testing of Dr. John Boughton on three occasions for approximately 6 hours, collateral interview with Mrs. Michelle Boughton, wife, lasting 2.5 hours.
- Psychological testing utilizing the Personality Assessment Inventory (PAI), Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2), Minnesota Multiphasic Personality Inventory-2 Restructured Form (MMPI2RF).
- Sex Offender Risk Appraisal Guide (SORAG).
- Forensic History Questionnaire Revised.
- Record reviews including psychological treatment summaries from Drs. Lawrence I. Sank and Joseph Cooper, testimonials from colleagues and the Presentence Investigation Report prepared June 26, 2009.
- Reviews of relevant literature (see references below).

Informed Consent/Confidentiality Waiver:

Dr. Boughton and others interviewed for this report were informed about the nature, scope, purpose and non-confidential nature of this evaluation. All were told that this report would be sent to defense attorney Jon Norris who would likely forward it to the Court and the prosecutor. Dr. Boughton was informed that I might be required to testify about my findings. Dr. Boughton acknowledged understanding these conditions and voluntarily agreed to participate in and proceed with this evaluation.

The information contained within this report is based upon a variety of sources derived from the procedures and documents referenced above. As a rule, this evaluation is written to analyze rather than reproduce material that has been presented elsewhere; the interested reader is referred to original source material for additional details that are not included here. The information in this report is considered to be reliable by this psychologist. Quotations or attributed statements were sometimes edited slightly to assure greater clarity for the reader.

Pertinent Background Information:

Dr. Boughton was born on November 1, 1958 in Abingdon, England to Frederick Albert Boughton, deceased in 1991 at the age of 76, and Alice Mary Boughton (maiden name Thompson), deceased in 1991 at the age of 64, six months prior to her husband's death. The defendant's father died from cardiac arrest; his mother from complications related to Alzheimer's disease. This marriage produced three children; the oldest, Brenda (DOB: 01/1949) died in 2004 at age 54 from leukemia. The second child Jane (DOB: 03/1952) is 56 years of age, living in London, England and disabled due to a brain infection she suffered three years ago. Dr.

2

Boughton's father was employed as a paralegal, his mother worked at a newsstand. Dr.
Boughton grew up in Shearingham County in Norfolk, England in a lower middle-class family.
He reported that his family members loved each other and interacted harmoniously. He neither
witnessed nor experienced neglect or abuse of any kind while he was growing up.

Dr. Boughton reported that his early development was remarkable for a significant loss of
hearing and near total deafness between the ages of five and nine. Five operations were required
to restore his hearing. During critical years that are the foundation for all subsequent social
development, Dr. Boughton was forced to withdraw from other children unable to hear and shut
out of childhood social interactions. In effect, his social development was derailed and put on
hold during his five years of deafness as he withdrew into his own solitary world and activities.
Dr. Boughton's capacities and skills for social interaction were never fully restored; after his
hearing returned he was developmentally delayed compared to others, awkward, anxious,
insecure and immature socially. During these years alone in "social exile," he became quite
depressed and anxious, spending his time in solitary activities reading, collecting and sorting his
toys, soccer programs, guidebooks, 'I Spy' books, various facts and other objects. This
obsessive-compulsive process appears to have originated during these years and continued
throughout his adult life as a means of coping with painful feelings of exclusion, alienation,
anxiety and depression. Dr. Boughton reported that socializing with other people has always
been difficult for him since becoming deaf; since then he is far more comfortable engaging in
solitary activities or letting others take the lead during social events. Dr. Boughton has been a
quiet and introverted person throughout all of his adolescence and adult life. He is extremely
uncomfortable with the unstructured and unpredictable "give and take" socializing with others;
"around other people I would always feel inferior despite my successes."

Dr. Boughton reported that the emotional tone of his home life changed forever during
his teenage years when his father suffered a nervous breakdown, openly sobbing and ruminating
about his life's failures in front of his family. Dr. Boughton reported the entire family was
shaken by this. Dr. Boughton recalls being fearful that his father would become so paralyzed by
depression that he would lose his job and the family would be destitute. Dr. Boughton's strong
identification with his father's anxiety, lack of self-confidence further undermined his own sense
of competence and agency resulting in rather limited ambition. His mother began to develop
Alzheimer's disease during this time and became more and more emotionally remote. In the
final stages of her illness, Dr. Boughton served as her primary caretaker, a stressful and
emotionally painful experience.

Despite being psychologically weighed down by these emotionally difficult experiences,
Dr. Boughton's considerable academic talents, capacity for obsessive detail and organization
resulted in his earning a Doctorate in Social History from the University of Manchester in 1984.
Dr. Boughton believes he was attracted to academic life because academia afforded him
opportunities to pursue and develop wide his ranging intellectual interests within the secure but
solitary setting of doctoral level independent study. Dr. Boughton earned a second post-graduate
degree in Education from the University of London in 1988 thereby enabling him to teach. Dr.
Boughton taught full time for approximately 12 years at Peter Symonds College in England until
2000. Dr. Boughton reported that he was always enjoyed lecturing before a class of students
despite his introversion; as a lecturer he could be around other people but from the safe distance

afforded by the lectern in the classroom. Teaching enabled Dr. Boughton to talk to others but in a controlled and structured setting. In class students responded to his questions or asked predictable questions; there was no unstructured and unpredictable conversation that would arouse tremendous anxiety and insecurity. Dr. Boughton has been around adolescent students continuously for 20 years. During this time his behavior has been impeccable according to his colleagues and friends. Dr. Boughton has never been charged with misconduct of any kind; the instant offense is Dr. Boughton's first arrest.

Dr. Boughton's sexual experiences have been anxiety provoking. As a child at age 10, he witnessed his parents engaging in sexual activity and was propositioned by an adult male for sex. Dr. Boughton described his parents as "liberal" about sex and he often saw them walking around naked in their house. During his teenage years he was first exposed to adult pornography in the family home. His mother routinely brought home magazines from her newsstand containing unclothed adult women for his father to read. Dr. Boughton reported that he would discover these not well hidden magazines and began reading them at age 15. From that point onward his interest in adult pornography continued an intermittent, off and on fashion, into his adult life. He reported that he would turn to adult pornography when he was lonely or not involved in a relationship with a woman. Dr. Boughton did not engage in any interpersonal sexual activity until university. Prior to meeting and marrying his wife Michelle, Dr. Boughton had 3 serious relationships with women: the first from 1984 to 1987 (he was 25, she was 19 at the start of the relationship); the second from 1988 to 1990, with cohabitation for one year (he was 29, she was 21 at the start of the relationship); the third from 1991 to 1992 (he was 33 she was 34 at the start of the relationship). Dr. Boughton and his wife have been happily married for 12 years; both were 37 years old at the time they met. Their marriage has been successful and emotionally fulfilling for both of them until Dr. Boughton's arrest in October 2008 put significant strains upon it. Dr. Boughton actively helped to raise his stepson Ben, who was 12 years old when his mother remarried. Ben has acknowledged that Dr. Boughton's loving concern for his well-being was critically beneficial to him during adolescence and early adulthood.

Dr. Boughton reported that engaging in sexual activities with girlfriends and his wife always made him very anxious. He has struggled with intermittent erectile problems and impotence for many years. He has always been extremely uncomfortable when his partners touched him physically. He has always feared sexual rejection and failure. He described pornography as a safe and solitary "bubble I could retreat into, where no one could touch or reject me."

In 2000, Dr. Boughton moved with his wife to the United States. This was necessary because his wife, a successful executive with the BBC had been offered a position in Washington, DC that was too good to turn down. Once in the United States, finding suitable employment was very difficult and adapting to the requirements of a new position was extremely anxiety provoking. Dr. Boughton was able to secure a non-tenure track position at Goucher College that was full time for the most part, but occasionally part-time, depending upon the need for his services. He became a popular professor with both students and colleagues. Both Dr. and Mrs. Boughton agreed that his emotional state waxed and waned depending upon whether he was working part time or full time at the college. During the periods that he worked part time, the extra time on his hands resulted in a return of his depression due to the considerable loss of

daily structure, prestige and self-esteem attendant upon part-time teaching. Dr. Boughton's sense of loss and depression was compounded when his older sister died in 2004, her death hastened by mistakes made during her hospital treatment for leukemia. His sister's death and other losses described above triggered profound abandonment depression and anxiety further intensifying Dr. Boughton's need to soothe himself with his many obsessive-compulsive rituals. Dr. Boughton's interest in pornography increased significantly as he has become more depressed, withdrawn and ruminative.

Dr. Boughton has engaged in obsessive-compulsive behavior throughout his life. University teaching channeled these behaviors in an adaptive and socially acceptable manner while collecting internet pornography did not. His wife described various repetitive rituals that her husband engaged in until the time of his arrest; these rituals stopped after his arrest. Dr. Boughton described his arrest as a relief from being driven to engage in these behavior patterns, especially collecting and cataloging internet pornography. His other rituals were less functional, though harmless for the most part. For years Dr. Boughton had to eat the same food at breakfast (Wheatabix) and lunch (ham and cheese sandwich) at precisely the same times every day. He insisted on the same brands of cereal, ham and cheese. Whenever he cooked dinner, he prepared the same five meals over and over again. If he was unable or prevented from doing any of these activities he became anxious and distressed. Dr. Boughton termed these habits "efficient eating" to his wife. At dinner with his wife, Dr. Boughton sits in his chair "with bent legs, on his knees." He continued to collect and catalog 'I Spy' books and that so engaged him during childhood. He is fascinated by and collects and catalogs materials on his genealogy and on "unbridged (sic) fjords." He must carry lip balm and a handkerchief with him at all times and he uses them 2-3 times an hour; if he runs out of lip balm he must immediately go to a store and purchase more, he cannot be without it. He must return email immediately and read several news oriented blogs repetitively throughout the day. Dr. Boughton's wife observed him repetitively viewing extremely depressing macabre images (e.g. deformed individuals) that were absolutely non-sexual in nature. Dr. Boughton reported that internet pornography permitted him to further collect and catalog "sets" of material. During the past year leading up to his arrest Dr. Boughton devoted more time to viewing this material becoming "agitated if I didn't do it every day." Overtime these various rituals culminated in a formal diagnosis of Obsessive-Compulsive Disorder (hereafter referred to as OCD). These OCD rituals have organized Dr. Boughton's life while buffering him from the disorganizing effects of anxiety and depression. He has twice been treated for OCD by Dr. Lawrence Sank in 2001 and 2008. Dr. Boughton never required psychiatric medication nor has he ever been psychiatrically hospitalized.

<u>Mental Status Examination:</u>

Dr. Boughton presented for this evaluation neatly attired in casual clothes. He was alert, fully oriented and in no acute distress. His affect was normally responsive to the content of the interview but his underlying mood was somber and serious throughout. Twice he openly cried while describing his remorse over his betrayal of and misery inflicted upon his wife and the unwitting harm to children caused by his crime. His attention and concentration were within normal limits. His memory for immediate, recent and remote events was within normal limits. His speech was sophisticated, articulate, grammatical and goal directed. He frankly acknowledged and appeared to be severely depressed; he is eating and sleeping poorly. His fund

of knowledge was impressive; intelligence was estimated to be in the superior range. He specifically denied past or present suicidal or homicidal ideas or intent; despite this denial the testing put him at risk for suicidal behavior under stress. He reported no allergies or head injury. There were no symptoms of psychosis. His judgment and insight were unimpaired. He reported drinking 1 or 2 glasses of wine with dinner and 1 or 2 beers on the weekend. He reported first trying alcohol at age 16. He has never tried illicit drugs.

Review of Relevant Literature:

Until recently, the likelihood of reoffending by child pornography users has been unstudied and as a consequence unknown (Seto & Elke, 2005). There is now a small body of empirical research into some of the psychological characteristics of internet child pornography viewers and the likelihood that they will commit a contact sexual offense (e.g. a sexual offense involving actual sexual contact with a child) in the future. These are critical issues for conducting informed risk assessments for possible future offending and for assisting the court in determining the extent to which an individual can be rehabilitated. For the most part the base rate (the prevalence of a particular characteristic or behavior within a particular population, expressed as a proportion or percentage) for reoffending in any fashion is very low for consumers of child pornography in any media. Most of the initial research into these issues has been conducted within the past five years to eight years. Overall, this research suggests that Dr. Boughton is at very low risk for reoffending and his prognosis in treatment is excellent.

Burke, Sowerbutts, Blundell & Sherry (2001) offered the first profile of internet child pornography users, contrasting them to individuals who have committed contact, hands on, sexual offenses against children. In this study, internet child pornography users tended to be (like Dr. Boughton) males between the ages of 25-50, with no criminal background, who were better educated, more intelligent, employed and in a committed relationship.

Seto & Elke (2005) conducted the first ever study to report on later offending in a sample of child pornography viewers in an effort to determine the likelihood that such offenders would later commit a contact sexual crime. A sample of 201 adult male child pornography viewing offenders in police databases was examined in an effort to determine predictors of subsequent offenses. The average follow-up time at risk in the study was 2.5 years. Significantly, only 0.5% of offenders (1 out of 201) with child pornography viewing offenses alone committed a contact sexual offense during the follow-up period. This statistically significant finding provides no empirical support for the hypothesis that child pornography offenders are at high risk to commit contact sexual offenses with children. Instead, the individuals at risk for future sexual contact offenses were individuals with prior criminal offenses, especially those with prior sexual contact offenses against children. The child pornography viewing recidivism rate among individuals with no other offenses was similarly low; just 6% (11 child pornography viewers out of 201) reengaged themselves in child pornography viewing.

Two very recent studies, in 2007 and 2009, sought to identify psychological characteristics of internet child pornography offenders and compare these individuals with contact sexual offenders. Webb, Craissati & Keen (2007) studied a sample of 210 individuals, 90 (43%) had an internet child pornography viewing offenses while 120 (57%) had a contact

sexual offense with a child. Seven of the internet offenders (7%) had prior sexual offenses while three (3%) had prior violent offenses; no internet offenders had both sexual and violent prior convictions. Only one internet offender had a prior sexual conviction and a pending charge. Both types of sex offenders had difficult childhood experiences but contact offenders reported significantly more childhood physical abuse. There were no major differences between offense groups in personality and mental-health functioning. Both groups could be characterized as introverted and interpersonally avoidant who retreat from social situations fearing rejection. Significantly, contact offenders were significantly more likely to offend again. Internet offenders were "extremely compliant with community treatment and supervision." In the internet group, 86% did not reoffend; the 14% that did reoffend did not view child pornography or commit a contact offense against a child. In those cases, the subsequent offense was non-sexual in nature. This study suggests that Dr. Boughton poses little risk for reoffending.

Elliott, Beech, Mandeville-Norden & Hayes (2009) compared a sample of 505 internet sex offenders with 526 contact sex offenders on various psychological measures. Internet offenders were different from contact offenders on 7 out of 15 measures of psychological functioning. Replicating results of their earlier study (Middleton, Elliott, Mandeville-Norden & Beech, 2006), the majority of internet offenders were characterized by "intimacy deficits and emotional dysregulation." Intimacy deficit individuals accessed child pornography during times of loneliness and anxiety. These individuals had low self-esteem, avoidant or anxiety ridden interpersonal interactions and low expectations for being able to either initiate or maintain relationships. Internet offenders with emotional dysregulation problems could not control the intensity of strong negative mood states such as anxiety and depression; these individuals used internet pornography to reduce emotional distress. There was little evidence that internet offenders had the deviant sexual arousal or the cognitive distortions typically found in contact child molesters (Middleton et al., 2006). Contact offenders are inclined to blame other people, make impulsive decisions, behave aggressively and lack empathy; internet offenders are submissive, have a greater ability to empathize with victims, use their imagination to relate to fictional characters and do better in therapy. It is significant that this study found that internet offenders are not "pathologically motivated or driven by the uncontrollable sexual urges" of contact offenders. Instead, situational and environmental factors such as stress, dysphoric emotions and disappointments give rise to internet offending (Middleton, et al., 2006). Once again, this study suggests that Dr. Boughton is a low risk for reoffending and will benefit from mental health treatment.

<u>Psychological Test Results/Diagnosis:</u>

*Personality Testing:*

Dr. Boughton answered the test questions in an honest and open fashion. His responses did not over report or under report symptoms of emotional distress. Dr. Boughton's test profiles were consistent with each other (high convergent validity), with his personal history and with a diagnosis of Obsessive-Compulsive Disorder (OCD). Dr. Boughton has exhibited the classic symptoms of OCD in the DSM-IVTR including: recurrent and persistent thoughts, impulses and repetitive behaviors aimed at reducing emotional distress, albeit in an unrealistic and ineffective fashion. Throughout his life Dr. Boughton's obsessions and compulsions have relieved or

buffered his low self-esteem, avoidance, anxiety and depression. While these symptoms have characterized him since early childhood, the intensity of these symptoms wax and wane depending upon varying situations and the nature and degree of stress in his life.

The testing suggested that Dr. Boughton is a sad, tense, anxious and self-conscious individual who feels his dysphoric and painful emotions more intensely than others do. He is prone to painful rumination and works hard to distract himself from these thoughts. He is pessimistic and has difficulty experiencing pleasure. He is plagued by neurovegetative symptoms and gastrointestinal complaints that are likely stress-induced. In the presence of other people he is hypersensitive to rejection and tends to relate to others in a rather rigid fashion ("mechanical" is how his wife characterized him). He is uncomfortable around others, dislikes group activities and distances himself. He is submissive and unassertive, suppressing disagreements and shunning possible conflicts with others. He strongly prefers solitary activities that function to keep him away from other people. As his wife noted, if there is nothing to do, he will create something to do. The testing specifically ruled out any antisocial attitudes and behavior.

*Risk Assessment:*

There are no instruments designed to assess risk for committing either a future internet offense or contact crime, with samples of internet child pornography viewers. The extant research literature cited above found virtually no support for the hypothesis that internet child pornography viewers progress to commit contact sexual offenses. The only known base rate study for internet child pornography viewers (Seto & Elke, 2005) found that 0.5% (only 1 out of 201) of internet child pornography viewers, with no history of other offenses, such as Dr. Boughton, committed any further offense during a 2.5 year follow-up period. The Sex Offender Risk Appraisal Guide (SORAG) is an actuarial instrument designed to predict risk of reoffending with individuals convicted of contact sexual offenses. The SORAG cannot validly estimate reoffense risk with internet offenders. This instrument was used here only to provide a very stringent estimate of Dr. Boughton's risk for committing a contact offense with a child. Dr. Boughton's SORAG score of -15 placed him in category one, the lowest risk category (there are nine risk categories). If Dr. Boughton had ever committed a sexual contact offense, there would be a 7% to 9% probability that Dr. Boughton would reoffend over the course of seven to ten years. It is critically important to note that these low percentages for contact reoffending, (that represent lowest risk category on the SORAG), are high compared to the infinitesimally low base rate for internet viewer recidivism. The base rate of 0.5% for internet viewers reoffending in the Seto and Elke (2005) study provides additional support that clearly indicates that Dr. Boughton poses virtually no risk for reoffending.

Drs. Conroy and Murrie (2007) acknowledging that accurate base rates of contact sexual reoffending have been very difficult to determine, furnished several risk factors with strong empirical support derived from the research literature. On virtually all of these risk factors Dr. Boughton presented a low risk despite the fact that he had never committed a contact sexual offense which is the major assumption behind all of these risk factors. Factors indicative of low risk include: no prior sexual or violent offenses, no antisocial lifestyle, no past treatment failures, late age of arrest, being married or in a stable relationship, heterosexual interests, no substance

abuse and a history of gainful employment. These risk factors provide further convergent validity (in other words, multiple sources of information point to the same conclusion) that Dr. Boughton is at very low risk for future offending of any kind.

Discussion:

Dr. Boughton was examined at the request of his attorney Mr. Jon Norris, Esquire to assist the Court at sentencing on July 29, 2009. This is Dr. Boughton's first arrest in any jurisdiction. This forensic psychological assessment places Dr. Boughton at very low risk for future reoffending. This conclusion is based upon an analysis of his personal history, psychological make-up and examination of risk factors in the scientific literature.

Dr. Boughton was forthcoming and cooperated fully with all procedures employed in preparation of this report. Dr. Boughton expressed significant, on-going remorse and deep shame about all of his conduct that constitutes the instant offense. Dr. Boughton does not want to ever reengage in this activity again. He remains significantly disturbed and frankly disgusted by his conduct; he is fully aware of the harm he has caused children as a consumer of internet child pornography. Dr. Boughton's intensive psychotherapy with Dr. Sank appears to be on track to ensure that the obsessive compulsive process driving the instant offense is stopped or redirected so the offensive behavior does not recur. Obsessive compulsive disorder (OCD) is an eminently treatable psychological condition. Dr. Boughton is highly motivated to continue treatment and he actively practices the strategies and techniques learned in on-going therapy. Consistent with patients suffering from obsessive compulsive disorder (OCD) who want better control over OCD driven activities, Dr. Boughton experienced tremendous relief when he was arrested and these activities were terminated by the authorities. Dr. Boughton's internet activity was not the product of long-standing aberrant attitudes or desires. There is absolutely no evidence in either his personal history or in the scientific literature to suggest that Dr. Boughton ever would engage in pedophilic activities. The research literature shows no connection between viewing internet child pornography and subsequent pedophilic contact offenses. Psychologically, Dr. Boughton tends to avoid social interactions which trigger intolerable anxieties.   His personal and professional conduct has always been exemplary and above reproach. Over a university teaching career spanning more than two decades he has inspired countless students and numerous colleagues. He has always been devoted to family, helping and caring for his ailing father, mother and sisters in their times of need and disability. He is a loving, steadfast husband and step-father who made critical and beneficial contributions to his step-son's emotional development helping to shepherd him from early adolescence into young adulthood since marrying his wife Michelle twelve years ago.

Dr. Boughton's many achievements in adulthood are especially remarkable considering his modest origins, tragic vicissitudes of his family's life, his shyness and lifelong vulnerability to anxiety and depression. His sudden deafness at age five isolated him from other children for nearly five years. The resulting social isolation and accompanying emotional disruptions put into motion anxious obsessive compulsive habits and interests that have driven and determined the course of his life from that time forward. In effect, between the ages of five and ten, Dr. Boughton built an obsessive compulsive "engine" by collecting and classifying things during boyhood when he was effectively shut out of social interactions. These repetitive activities

provided meaning, organization and most importantly, comfort during his lonely childhood. This obsessive compulsive "engine" engaged Dr. Boughton in a variety of repetitive, ritualistic, solitary and self-soothing behaviors that are described above. Dr. Boughton's obsessive compulsive disorder (OCD) functions like an automobile engine in different gears, each gear consisting of a different obsessive compulsive activity. Explaining OCD using this mechanical automotive metaphor, the OCD engine runs continuously, the different gears produce a variety of repetitive organizing activities that in turn, keep anxiety and depression within tolerable limits; this process enables the car to run and Dr. Boughton to live his life in a productive fashion. With the help of Dr. Sank, Dr. Boughton is already rebuilding the OCD engine and gearbox to ensure that his Internet viewing behavior does not recur.

Dr. Boughton's OCD repertoire did not involve viewing Internet child pornography until stresses in his adult, present day life became unbearable. These stressors have been discussed above; relocating to another country disrupted lifelong stable routines which combined with the death of one sister and major disability of another, triggered a new phase of obsessive compulsive ideas and behaviors. In the words of the above metaphor, the OCD engine shifted into a new gear. As Dr. Boughton learns new ways of coping with life's pressures, thereby repairing the OCD engine in treatment with Dr. Sank, his prognosis for full recovery is excellent. In my professional opinion, to a reasonable degree of scientific certainty, there is virtually no risk that Dr. Boughton will engage in this illegal activity again.

I hope this psychological evaluation knowledgeably informs the Court's deliberations. If there are any questions about this report please contact me using the information on the letterhead. I would be happy to appear before the Court if it is deemed that testimony would be helpful to deliberations about this matter.

Respectfully submitted,

Mitchell H. Hugonnet, Ph.D.
Licensed Clinical Psychologist
MD License #2464
DC License PSY-1480
VA License 0810001596
VA Certified Sex Offender Treatment Provider 081200162

10

References

Burke, A., Sowerbutts, S., Blundell, B. & Sherry, M. (2001). Child pornography and the Internet: Policing and treatment issues. *Psychiatry, Psychology and Law,* 9 (1), 79-84.

Conroy, M. A. & Murrie, D. C. (2007). *Forensic assessment of violence risk: A guide for risk assessment and risk management.* Hoboken, New Jersey: John Wiley & Sons.

Elliott, I. A., Beech, A. R., Mandeville-Norden, R. & Hayes, E. (2009). Psychological profiles of internet sexual offenders: Comparisons with contact sexual offenders. *Sexual Abuse: A Journal of Research and Treatment,* 21 (1), 76-92.

Middleton, D., Elliott, I. A., Mandeville-Norden, R. & Beech, A. R., (2006). An investigation into the applicability of the Ward and Siegert Pathways model of child sexual abuse with Internet offenders. *Psychology, Crime & Law,* 12 (6), 589-603.

Seto, M. C. & Eke, A. W. (2005). The criminal histories and later offending of child pornography offenders. *Sexual Abuse: A Journal of Research and Treatment,* 17 (2), 201-210.

Webb, L., Craissati, J., Keen, S. (2007). Characteristics of internet child pornography offenders: A comparison with child molesters. *Sex Abuse,* 19, 449-465.